**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMY MORAVICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  20-cv-06188 |
| | ) | |
| TEMPERATURE EQUIPMENT | ) | Hon. Judge John Z. Lee |
| CORPORATION, and | ) | |
| VINCE DESTEFANO, in his individual | ) | |
| capacity | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE AND MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

David J. Fish (dfish@fishlawfirm.com)
Thalia Pacheco (tpacheco@fishlawfirm.com)
FISH POTTER BOLAÑOS, P.C.
200 E. 5th Ave., Suite 123
Naperville, IL 60563
Tel: 312.861.1800

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

    I.    STATEMENT OF FACTS ................................................................................ 2

                 1.    Pervasive, Open and Notorious Physical and Verbal Sexual Harassment.................................................................................................. 2

                 2.    TEC Senior Management Acquiesced in and Encouraged Sexual Harassment and Ignored Complaints ......................................... 5

                 3.    TEC removed Amy's Accounts on The Basis of Gender .................... 6

                 4.    The ABT Appliances Account, Amy's 2020 Sexual Harassment Complaints, And Her Pretextual Termination ................. 8

                 5.    Mertz and TEC Build A "Record" To Justify Termination. ................. 9

    II.  LEGAL STANDARD .................................................................................... 11

ARGUMENT ............................................................................................................... 12

    I.    Hostile Work Environment Claims.............................................................. 12

        A.  Plaintiff's Hostile Work Environment and Discrimination claims are timely. ................................................................................................ 12

        B.  The Record Contains Ample Evidence of Severe, Pervasive Conduct. .......... 13

        C.  There Is Employer Liability Because TEC Was on Notice of the Harassment and Negligent in Remedying Harassment................................... 15

    II.  Equal Pay Act. ............................................................................................ 16

    III.  Plaintiff's Gender Violence Claim Is Timely. ............................................. 16

    IV.  The Record Supports Plaintiff's Sex Discrimination Claims. ..................... 18

        A.  Plaintiff's claims are timely. ............................................................... 18

        B.  Amy Suffered an Adverse Action. ...................................................... 19

        C.  Plaintiff Identified Other Similarly Situated Workers but This Is Not Required. ............................................................................................. 19

    V.  The Record Support's Amy's Retaliation Claim. ........................................ 21

        A.  Plaintiff Engaged in Protected Activity. .............................................. 21

        B.  A Reasonable Jury Could Conclude Defendant Terminated Amy Because of Her Protected Activity................................................................. 22

CONCLUSION............................................................................................................ 25

**Page**

## Cases

*Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841 (7th Cir. 2008).........................................................23

*Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698 (7th Cir. 2012) ........................................................21

*Armbruster v. Epstein and Regal Corrugated Box Co.*, 1996 WL 289991 (E.D. Pa. May 31, 1996) ........23

*Baines v. Walgreen Co.*, 863 F.3d 656 (7th Cir. 2017)..............................................................................24

*Boeving v. City of Collinsville, Illinois*, 21-CV-00353-JPG, 2021 WL 5906087 (S.D. Ill. Dec. 14, 2021)........................................................................................................................................................19

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007)...........................................................16

*Chaib v. Indiana*, 744 F.3d 974 (7th Cir. 2014).......................................................................................20

*Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005).......................................................................25, 27

*Curtis v. City of Chi.*, 16 C 8042, 2019 WL 3776154 (N.D. Ill. Aug. 12, 2019).......................................13

*Daoud v. Avamere Staffing & Home Care*, 336 F. Supp. 2d 1129 (D. Or. 2004)......................................25

*Faragher v. City of Boca Raton*, 524 U.S. 775 .......................................................................................17

*Fischer v Avanade, Inc.*, 519 F.3d 393 (7th Cir. 2008)..............................................................................26

*Gasic v. Marquette Mgmt., Inc.*, 2019 IL App (3d) 170756 .....................................................................19

*Goka v. Bobbitt*, 862 F.2d 646 (7th Cir.1988). .......................................................................................13

*Hess v. Bd. Of Trs. Of S. Ill. Univ.*, 839 F.3d 668 (7th Cir. 2016).............................................................13

*Hicks v. Forest Pres. Dist. Of Cook Cty.*, 677 F.3d 781 (7th Cir. 2012) ...................................................24

*Hilgers v. Rothschild Inv. Corp.*, 15 C 3572, 2017 WL 4164036 (N.D. Ill. Sept. 20, 2017)..........14, 16, 27

*Hrobowski v. Worthington Steel Co.*, 358 F.3d 473 (7th Cir. 2004) ........................................................17

*Humphries v. CBOCS West, Inc.*, 474 F.3d 387 (7th Cir. 2007).................................................................21

*Insolia v. Philip Morris, Inc.*, 216 F.3d 596 (7th Cir. 2000).......................................................................13

*Jackson v. Aulick Chem. Sols., Inc.*, 5:16-CV-452-JMH, 2018 WL 310139 (E.D. Ky. Jan. 5, 2018)........26

*Jackson v. Cty. of Racine*, 474 F.3d 493 (7th Cir. 2007) .......................................................................15

*Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018)..........................................21

*Kielczynski v. Village of LaGrange, Ill.*, 19 F. Supp. 2d 877 (N.D. Ill. 1998)....................................14, 24

*Kotoklo v. DePaul Univ.*, 20-CV-0635, 2021 WL 4477947 (N.D. Ill. Sept. 30, 2021) .............................22

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3rd Cir. 2012) ..........................................25

*Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766 (7th Cir. 2008) ...................................................23

*Malin v. Hospira, Inc.*, 762 F.3d 552 (7th Cir. 2014) .......................................................................14, 24

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .......................................................................13

*Melton v. Five Four Corp.*, No. 99 C 1274, 2000 WL 97568, at *11 (N.D. Ill. Jan. 25, 2000)..................23

*Morales v. Merit Systems Prot. Bd.*, 932 F.2d 800 (9th Cir. 1991) .............................................................. 25

*Mundo v. City of Chi.*, 2021 U.S. Dist. LEXIS 144944 (N.D. Ill. Aug. 3, 2021) ...................................... 19

*National Rail. Pass. Corp. v. Morgan*, 536 U.S. 101 (2002) ...................................................................... 14

*Nischan v. Stratosphere Quality, LLC,* 865 F.3d 922 (7th Cir. 2017) ....................................................... 17

*Ortiz v. Werner Enterprises, Inc., 834 F.3d 760 (2016)* ........................................................................... 13

*Passananti v. Cook Cty.*, 689 F.3d 655 (7th Cir. 2012) .............................................................................. 15

*Quantock v. Shared Mktg. Servs.*, 312 F.3d 899 (7th Cir. 2002) ............................................................... 15

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ......................................................... 26

*Reszetylo v. Morgan Stanley Dean Witter & Co.*, 84 Fed. Appx. 822 (9th Cir. 2003) ....................... 23, 24

*Rice v. Universal Beauty Products, Inc.*, No. 1:19-cv-01378 (N.D. Ill. Sept. 28, 2021) .......................... 21

*Robinson v. Perales*, 894 F.3d 818 (7th Cir. 2018) .................................................................................... 15

*Sabet v. City of N. Chicago*, 16-CV-10783, 2020 WL 832360 (N.D. Ill. Feb. 20, 2020) ......................... 14

*Sempowich v. Tactile Sys. Tech., Inc.,* 19 F.4th 643 (4th Cir. 2021) .......................................................... 25

*Sitar v. Indiana Dept. of Transp.,* 344 F.3d 720 (7th Cir. 2003) .......................................................... 22, 24

*Smith v. Rosebud Farmstand*, 909 F. Supp. 2d 1001 (N.D. Ill. 2012) ........................................................ 19

*Solinski v. Higher Learning Comm'n*, 1:20-CV-05236, 2021 WL 1293841 (N.D. Ill. Apr. 7, 2021) ........ 19

*Sumi Cho v. Rosato Perea,* 18 C 8117, 2019 WL 4645419 (N.D. Ill. Sept. 24, 2019) ............................... 23

*Swyear v. Fare Foods Corp.*, 911 F.3d 874 (7th Cir. 2018) ....................................................................... 16

*Taylor v. Metro. Water Reclam. Dist.*, 15-CV-7855, 2020 WL 1503642 (N.D. Ill. Mar. 30, 2020) .... 15, 17

*Vance v. Ball State Univ.*, 646 F.3d 461 (7th Cir. 2011).............................................................................. 17

*Young v. Bayer Corp.*, 123 F.3d 672 (7th Cir. 1997).................................................................................. 17

## Statutes

720 ILCS 5/12-3 ......................................................................................................................................... 18

720 ILCS 82/20 ........................................................................................................................................... 18

740 ILCS 82/5 ............................................................................................................................................. 18

## Other Authorities

*11 Words We Need to Stop Using to Describe Women*................................................................................ 25

Lonsway, Kimberly, PhD, *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement and Respond*, (Nov. 2020)........................................................................................ 19

## Rules

29 C.F.R. § 1604.11(d) ............................................................................................................................... 17

Fed. R. Civ. P. 56(a) .................................................................................................................................... 13

## **INTRODUCTION**

Amy Moravick ("Amy")—a former Olympic and all-American athlete—had the grit, tenacity, and determination to become the #1 ranked Territory Manager ("TM") at Temperature Equipment Corporation ("TEC") placing her ahead of each of her 12 male co-workers. She did this while putting up with sexual abuse from Defendant Vince DeStefano ("Vince"), a 40+ year TEC veteran who tried sexually assaulting Amy and, because she refused, he tormented her.

TEC's management, even its president, contributed to this sexually abusive environment. For example, TEC's President Skip Mungo did nothing when he saw Vince try to put Amy's hand on his crotch while saying "you will not be disappointed"; President Mungo himself tried to kiss Amy inappropriately; other women did "blow job shots" out of Mungo's lap; and he encouraged TMs to take customers to strip bars. When racist or sexist comments were made, he made it clear that nothing would happen by saying "it's a good thing I am in charge of human resources!"; similarly, other TEC officers dismissed this conduct to the female workers by saying "you know it's the boys club."

On Christmas Eve 2019, after a decade of TEC abuse, Amy landed a whale of an account— ABT Appliances—that could double her income. When she tried to arrange a factory tour for this new customer, her supervisor Chad Mertz ("Mertz") told her that she couldn't do that because "you are a woman" and a woman cannot take a customer on a trip without management (even though male TMs could). Amy went over his head and complained to several other TEC management members about her experiences at TEC and Mertz's discriminatory comments. Mertz told a co-worker that Amy could not be fired because of her gender-based complaints. He then solved this problem by coming up with pretextual reasons to fire her—
at a time when she was at the pinnacle of her career.

Considering the evidence as a whole and in the light most favorable to her, Plaintiff has presented sufficient evidence to raise a genuine issue of material fact on the issues.

## I.    STATEMENT OF FACTS[1]

Amy started working for Defendant TEC in 2009, a company with about 500 employees,. Plaintiff's Statement of Additional Material Facts ("SOAF") ¶1. When she interviewed for the job, President Mungo, told Amy that TEC does not normally hire women for the TM position, but he had a good feeling about her and then, instead of shaking her hand, gave her a hug and kiss. SOAF ¶6. Amy was the only female residential TM during her decade plus employment there. SOAF ¶1.

### 1.  Pervasive, Open and Notorious Physical and Verbal Sexual Harassment

Sexual harassment was condoned and engaged by TEC's senior management. *See* SOAF ¶¶14, 16, 23, 24. During a Las Vegas work trip in October 2012, President Mungo grabbed Amy by the waist and buttocks and put her on his lap while he was gambling in front of other TEC employees. SOAF ¶14. Later, he put his arm around Amy and began kissing her face. *Id.*

Vince is a TEC shareholder and 40+ year TEC employee. SOAF ¶2. He also is one of Mungo's closest friends; for example, they vacation together, and Mungo stood up in Vince's wedding. *Id.* On the same Las Vegas work trip where Mungo grabbed and kissed Amy, Vince grabbed Amy's hand and tried to place it on his crotch on several occasions. SOAF ¶14. As he was assaulting Amy, Vince told her: "It's not small, you're not going to be ·disappointed. Here, grab a feel on this." *Id.* Vince openly engaged in this conduct in front of 8 to 10 TEC employees, including Mungo. *Id.*

The next day, on October 25, 2012, Amy excused herself from an employee gathering to use the bathroom and Vince followed her. SOAF ¶15. He said: "I think the bathroom is this way"

---

[1] Plaintiff incorporates by reference her Response to Defendant's Local Rule 56.1(a) Statement of Material Facts and Plaintiff's Statement of Additional Material Facts as if fully restated herein.

and he led her to an empty convention room. *Id*. Vince then forced the front of his body onto Amy, pushed her up against a table, and started to unzip his pants. *Id*. Vince said, "let's just fuck now." *Id*. Amy refused his advances, but he persisted, telling her: "if you aren't going to fuck me then at least suck my dick." *Id*. Amy pushed back and fled. *Id*. Amy reported this assault to another TM, Jason Urbanski ("Urbanski"), the following morning in tears. *Id*.

Vince tormented Amy with offensive sexual comments, gestures, and touching during her "entire tenure" at TEC, including through December 2019. SOAF ¶¶14, 15, 17-21. He repeatedly badgered her for sexual favors. SOAF ¶¶17-21. For example, at a company sales meeting in 2014 Vince said: "Why don't you come into the men's restroom…so you can suck my dick," and then proceeded to make a sexual gesture. SOAF ¶15. Vince openly made crude sexual comments and advances to Amy in front of others. SOAF ¶¶14, 17, 20, 21. For example, in front of another employee, Vince was observed outside a sales meeting saying to Amy: "Why don't we go into the bathroom together so you can fuck me?" SOAF ¶17.

In 2017 and 2018, Vince was observed saying on different occasions: "Come give me a blow job," "Let's go into the women's bathroom" or "Let's go back into the bathroom and get this done," or "Today's the day." SOAF ¶17. On at least one occasion, the entire TM team was in a small room when Vince requested oral sex request from Amy. *Id*. Urbanski witnessed Vince grab Amy on two occasions. *Id*.

During the time Amy worked at TEC, through 2020, there were monthly meetings. SOAF ¶18. Vince subjected Amy to sexual comments and explicit sexual advances at most of the meetings, right in front of everyone. SOAF ¶¶17, 18, 21. Examples of things he regularly said to her were: "Looking good today; let's go in the bathroom and suck my dick," "C'mon get on your knees and suck my dick," "Let's fuck in the bathroom," "Looking good today my dick is hard,"

"You're fucking hot today---mmmm c'mon let's get it over with," and "Looking good today my dick is hard," among other harassing remarks. SOAF ¶18. At the monthly meetings, Vince positioned himself so that Amy had to physically pass close by him at meeting breaks when returning from the restroom. SOAF ¶19. He openly grabbed his genitals, winked at Amy, licked his lips, touched his pants zipper, pointing in a direction like let's go, made motions like he was wanting to have sex, and made oral sucking motions with his hand to his mouth, all directed towards Amy. *Id.* This sexual harassment occurred between 75% to 80% of the monthly meetings including through December 2019. SOAF ¶21.

Amy did not like being sexually harassed; she told Vince he was disgusting and that she could not believe he would do these things to her. SOAF ¶20. For example, in 2018, Vince requested that Amy perform oral sex in front of the entire TM team, including Vince's brother and fellow TEC shareholder John DeStefano. SOAF ¶17. This time, Amy told Vince: "You have to stop doing this." *Id.* She then looked at John DeStefano and said "You need to get him to stop doing this. This is out of control." *Id.* In mid-2019, Vince said to Amy: "You look hot today.  Do you want to suck my dick?" SOAF ¶20. She complained to John DeStefano again and this time the harassment eased, for only about a month, but then started up again including through December 2019. *Id.* Defendants' assertion that the most recent incident of sexual harassment occurred in June or July 2019 is incorrect. *See* Plaintiff's Response to Defendant's Local Rule 56.1(a) Statement of Material Facts ("RDSOF") ¶7, *see also* Defs.' Mot. for Summ. J., 6. Vince subjected her to sexual harassment through at least December 2019. SOAF ¶18.

TEC held an annual luncheon for its female employees, which Mungo attended.  SOAF ¶24. At these events, President Mungo encouraged female employees to get on their knees and

take "blow job shots" out of his lap. *Id*. A "blow job shot" entailed the women putting their mouth around a shot glass without using their hands to simulate oral sex. *Id*.

As a result of the harassment, Amy suffers from PTSD, has a fear of closed meeting spaces, has trouble sleeping, had severe panic attacks, and was even forced to go to the emergency room on several occasions. SOAF ¶22. Being a woman in TEC's culture made her feel like she was on the defensive, and it interfered with her job. *Id*.

### 2. TEC Senior Management Acquiesced in and Encouraged Sexual Harassment and Ignored Complaints

Having engaged in sexually harassing conduct himself, President Mungo reassured employees that they would not get in trouble for inappropriate behavior by, for example, when there were sexist or racist comments made at the monthly meetings, Mungo said: "it's a good thing I'm the head of human resources." SOAF ¶14, 21, 24. In late 2019, Mungo mocked, and joked about, the sexual harassment training that TEC had to do as required by Illinois law. SOAF ¶24. He said the training was a joke and that it was a good thing he was the head of human resources. *Id*. When Vince sexually harassed Amy at the monthly meetings it was often with dozens of attendees present, including management from different TEC departments. SOAF ¶21. TEC also encourages TMs to take customers to strip clubs, and many of them have done so, including one who is on TEC's executive team and Board of Directors. SOAF ¶23.

TEC does not investigate sexual harassment or sex discrimination claims. SOAF ¶9, 21. President Mungo has not asked anyone to investigate Amy's allegation and never even asked Vince (despite being very close with him) whether the allegations against him in this case are true. SOAF ¶21. In 2020, upon Amy's departure, another female TEC employee (Melissa Olovich) sent a lengthy email to everyone at TEC (including management) about how TEC treats women. SOAF ¶9. As she put it:

**In a society where people work so hard to progress forward and move towards equality, TEC is still stuck in the Stone Age. The lack of diversity coupled with treatment of the women is disappointing. I would mention minorities, but there are so few. I will focus on the treatment of the women instead. The Women are often passed over for promotions: they are paid less than their male counterparts who lack equivalent experience and or education. There are zero women in real positions of power within the company. …Women here are spoken down to in a way that no man would allow for. It is nothing short of repulsive witnessing TEC men implementing whatever it is they like with little to no repercussions.**

*Id*. Mungo testified he does not even understand how this email related to how women were treated at TEC. *Id.* TEC quickly deleted the email from its system so other employees could not read it and did not conduct an investigation about it. *Id*.

As the only female residential TM at TEC, Amy decided to get involved in female industry groups outside of TEC. SOAF ¶26. TEC's upper management mocked Amy for doing so. *Id*. Mike Smid and Jim Ottoman berated her for wasting time at a female industry event (Bryant Women in HVAC) and made discriminatory and sexist comments to her about it. *Id*. Amy complained to Mungo about how Smid and Ottoman treated her in this regard, he told Amy not to worry and then promoted Smid to Executive Vice President shortly thereafter. *Id*.

### 3. TEC Removed Amy's Accounts on The Basis of Gender

While TEC paid male and female TMs the same commission rates, Amy's male managers had discretion in account assignment, and this had a dramatic impact on compensation. SOAF ¶10. These were the same managers who would make sexist comments towards Amy because she was a woman. SOAF ¶7. Unlike her male counterparts, Amy's managers kept accounts from her to keep her territory from expanding. SOAF ¶¶12, 13.

For example, TEC took the Roberts Heating account away from Amy because the customer did not want a female TM. SOAF ¶25. Amy's supervisor admitted this was in fact why she was removed from this account. *Id*. Amy complained to President Mungo about the Roberts account being taken because she was a woman. *Id*. Mungo was dismissive and justified the gender-based

adverse action by claiming that "the customer is always right in terms of what they want." *Id*. He promised Amy a replacement account, but this was not done. *Id*. Amy also complained about this to Ottoman and asked why TEC would conduct business with a customer (Roberts) who had discriminatory views about women. *Id*. Having never received her promised replacement account (to make up for Roberts and the resulting income diminution), in 2018, Amy again complained to TEC senior managers Ottoman and Smid about the gender-motivated removal of this account. *Id*. Smid justified it and said: "sometimes men are just more successful in this business" and that Amy was just a woman acting in a man's world. *Id*. Smid then said: "it's the boys club." *Id*. Ottoman would make similar statements to the few females in attendance at TEC monthly meetings to try to smooth things over when others, like Vince, made sexist comments. SOAF ¶7.

Amy's gender also impacted account assignments. SOAF ¶¶10, 12, 13. TEC's practice is that if a customer wants to work with a particular TM, TEC will accommodate the customer (*i.e.,* assign the customer to the requested TM). SOAF ¶13. This policy, however, only applied to male TMs. *Id.* When customers specifically requested Amy as their TM, TEC would not assign their account to her. *Id*. For example, Ameritemp requested that Amy remain its TM around 2020, but TEC did not assign it to Amy. *Id*. When a similar request was made for one of Amy's male counterparts, the account was transferred back to the male employee. *Id*. In 2017, TEC took the Green Air Care account away from Amy and gave it to two male TMs even though she brought this account to TEC. SOAF ¶¶13, 37.

In 2019, TM Jim Ready retired and had a territory that had to get reassigned. SOAF ¶12. His accounts were reassigned to only male TMs, many of whom already had larger territories than Amy and even though Amy had a proven record of growing her accounts and many of Ready's

accounts were located within her territory. *Id*. Despite being a top performer, Amy's per year compensation was at the low end in comparison to other TMs. SOAF ¶11.

### 4. The ABT Appliances Account, Amy's 2020 Sexual Harassment Complaints, And Her Pretextual Termination

On Christmas Eve 2019, Amy learned she had landed an enormous account—ABT Appliances. SOAF ¶5. This account had a multi-million-dollar potential and could have doubled her income. *Id*.

On approximately 8 to 10 occasions, from January 2020 through the end of her employment, Amy complained to Kathi Kunz, a TEC regional manager, about the sexual harassment and discrimination she experienced. SOAF ¶27. Amy thought as a woman Kunz would understand. *Id*. Amy told Kunz about how her superiors had made gender-based discriminatory comments (*i.e.,* that it was a boys club, etc.) and how stressful work was becoming as a result. *Id*. Kunz responded with her own gender-based struggles at TEC. *Id*.

During this same time, Amy was also arranging to accompany ABT on a factory tour. SOAF ¶8. Mertz told Amy that she could not go on this tour by herself because "you are a woman and women can't do that." *Id*. In contrast, male TMs went on factory tours with customers by themselves. *Id*.[2] Ottoman authorized Amy to arrange this tour. SOAF ¶38.

Amy was upset that her supervisor was using her gender to prevent her from attending this tour while her male TM counterparts were, once again, treated differently. SOAF ¶8. As a result, Amy complained to Mertz about "everything" she had been through at TEC relating to sexual harassment, sexism, and accounts being due to her gender. SOAF ¶29. She also reported to Mertz about Ottoman and Smid's comments concerning it being a "man's world." *Id*. In response, Mertz told Amy she could *not* talk to Mungo anymore about her concerns and said she had to go through

---

[2] After Amy was fired ABT was assigned to a male TM. SOAF ¶8.

him with any complaints. *Id*. Not being satisfied with Mertz's response, Amy still went over his head and complained to Mertz's boss (Ottoman) about Mertz restricting her tour with ABT because of her gender. SOAF ¶¶8, 29.[3] In 2020, Amy also told another one of Mertz's bosses, Smid, that she would not tolerate "a sexist and bullying work environment." SOAF ¶29.

In February 2020, just months before being fired, Amy won the Bryant Carrier President's Award. SOAF ¶3. The President's Award was an enormous honor and was based on criteria set by TEC and its supplier for evaluating TMs on important objective metrics such as sales, customer growth, and profitability. *Id*. Amy was the only TEC TM to win this award and ranked ahead of each of the other 12 TEC TMs (who were also all male). *Id*.

### 5. Mertz and TEC Build A "Record" To Justify Termination.

Towards the end of her employment, Mertz asked another TM how long he thought Amy would "stick around" at TEC, Mertz said Amy could not be fired because of her gender-based complaints, and then referred to her as a "firecracker waiting to explode." SOAF ¶40. Knowing he needed to create a record, Mertz came up with a list of reasons to fire Amy all of which are false and pretextual (and come at an odd time, *i.e.*, when Amy had just won the President's Award and had landed the enormous ABT account):

***"Poaching" Accounts***: TEC said Amy was fired in part because of "poaching" two accounts, Jacobazzi Heating and Chris Mechanical, away from other TMs. SOAF ¶37. These two customers confirmed in their deposition, however, that Amy in fact never poached them in any manner whatsoever ***and*** they never told anyone at TEC that she did. *Id*. What actually happened

---

[3] Both Ottoman and Mertz are TEC shareholders and are considered upper-level management on the executive team. SOAF ¶¶8, 23, 25. TEC has never had a female in upper management/executive team. SOAF ¶27.

was their male TMs were doing a poor job of servicing them and the customers knew of Amy's

stellar reputation, so they asked TEC to assign Amy to their companies. *Id*.

      ***Groundbreaking Write Up While at Doctor:***  On November 18, 2019, Mertz gave Amy a

Verbal Warning (in writing) for missing the second day of a two-day training meeting. SOAF ¶36.

Amy was not at the second day of the training because she had a medical appointment for her eye

because she could not see. *Id*. Not only was this the first time Amy had received any discipline

during her decade at TEC, but it was also groundbreaking for TEC: it was the first time Mertz had

ever written *anyone* and that (to TEC human resource's knowledge) *any TM* had been written up

for *anything ever*. *Id*. Amy notified Mertz why she was out, and even President Mungo agreed the

write-up was inappropriate. *Id*. Others regularly missed meetings (and were never written up in

the past for it) and Amy had near perfect attendance. *Id*. About 9 (out of 13) of the male TMs

missed the first day of the training; none were written up. *Id*.

      ***Losing Accounts:***  The Defendants claim that Amy was also fired for losing two accounts

over six months. RDSOF ¶¶16, 24. TMs lose accounts regularly without any repercussions

whatsoever-- Urbanski, for example, lost five accounts without any discipline at all (and he ranked

13 out of 13 in the President's Award standings). SOAF ¶39. More to the point, however, is that

Amy did not lose these accounts: they continued to do business with TEC. SOAF ¶32, 33.  They

did substantially reduced their purchasing from TEC because a competitor, Amana, offered them

much better pricing and rebates. *Id*. These customers loved Amy; they each even wrote her a letter

of recommendation and one was in tears when telling Amy, they had to sell Amana for financial

reasons. *Id*. The TM who took over one of the accounts after Amy was fired was told by the

customer that they liked Amy. SOAF ¶33. Finally, the loss of these accounts was not sudden: Amy

notified TEC management of the customers' concerns and TEC even tried to offer competitive

pricing—but it was not enough to match Amana. SOAF ¶32, 33. This had nothing whatsoever to do with Amy's performance. *Id*

**Shifting Reasons:** TEC has offered altogether different reasons for Amy's termination outside of the litigation context. SOAF ¶30. When a customer asked why she was gone, TEC falsely stated that for a month Amy was not at work. *Id*. And, at her termination, TEC told Amy she did nothing wrong whatsoever and it was just time to part ways. *Id*.

Finally, TEC has a progressive disciplinary policy, which Mertz testified he follows . SOAF ¶35. The steps for termination are (1) coaching, (2) verbal warning, (3) written warning, (4) final warning, and (5) suspension or termination. SOAF ¶35. Amy was not given a written warning, final written warning or a suspension, contrary to its own policy. *Id*.

## I.  LEGAL STANDARD

"Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Hess v. Bd. Of Trs. Of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  Defendants cannot meet their burden by "identif[ying] *only* those portions of the record which support [its] position ... [when] there exists evidence to contrary."  *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir.1988).

The legal standard used to evaluate an employment discrimination claim is "simply whether the evidence," considered as a whole "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (2016). Plaintiff is not limited to the  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) burden-

shifting framework as Defendants suggest. "Separate and apart from this framework (or, perhaps, in the process of engaging in it), a plaintiff can simply point to evidence in the record from which a reasonable jury could find prohibited discrimination." *Curtis v. City of Chi.,* 16 C 8042, 2019 WL 3776154, at \*10 (N.D. Ill. Aug. 12, 2019) (Lee, J.).

## ARGUMENT

### II. Hostile Work Environment Claims

#### A. Plaintiff's Hostile Work Environment and Discrimination Claims Are Timely.

Defendants argue "any claims prior to August 12, 2019, are barred" by Title VII's statute of limitations. This argument is misplaced because Amy's claims are timely so long as *one* act of the harassment occurred within the statutory period. *National Rail. Pass. Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (as long as at least one act occurred within 300 days before the filing of the EEOC charges, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."); *see also, Hilgers v. Rothschild Inv. Corp.*, 15 C 3572, 2017 WL 4164036, at \*5 (N.D. Ill. Sept. 20, 2017) (Lee, J.) ("the charge was timely only if at least one act contributing to the hostile work environment occurred within 180 days before this filing"); *Sabet v. City of N. Chicago*, 16-CV-10783, 2020 WL 832360, at \*8 (N.D. Ill. Feb. 20, 2020) ("the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.") Further, "Title VII does not bar an employee from using the prior acts that fall outside the statute of limitations as background evidence in support of a timely claim." *Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014); *Kielczynski v. Village of LaGrange, Ill.*, 19 F. Supp. 2d 877 (N.D. Ill. 1998) (allowing the admission of a 16 year period of discrimination under continuing violation doctrine).

Amy continued to suffer harassment and discrimination after August 12, 2019, including that: (a) Vince made harassing comments to her during her "entire tenure" at TEC, including the December 2019 sexual request (SOAF ¶18); (b) in early 2020, with respect to the ABT factory tour, Mertz told her "you are a woman and women can't do that" (SOAF ¶8); (c) after reporting discrimination to Mertz in 2020, Mertz prohibited Amy from talking to President Mungo or using the benefits of the handbook (that allows for complaints to others) (SOAF ¶29); (d) Amy was written up in November 2019 when she was at the doctor (while men were allowed to miss meetings) (SOAF ¶36); (e) in 2020 Ameritemp wanted to keep Amy as its TM, but she was not allowed to remain (yet males were allowed to keep accounts that requested to stay with them) (SOAF ¶13); (f) in 2019, Ready's accounts were assigned only to male TMs (SOAF ¶12), (g) post-termination one of TEC's customers was falsely told Amy neglected her job (SOAF ¶30); (h) during the 2019 and 2020 time period Amy continued to suffer financially from accounts that were taken away from her earlier on the basis of her gender (SOAF ¶¶13, 25); (i) and she was terminated on May 13, 2020, for pretextual reasons (SOAF ¶30-40). As such, Amy's claims are timely.

**B. The Record Contains Ample Evidence of Severe, Pervasive Conduct.**

The Defendants argue there is insufficient evidence of severe, pervasive conduct to support a hostile work environment claim. (Defs.' Mot. for Summ. J., 7). Defendants' argument is based on a one-sided, incomplete, and misleading statement of facts. The record contains ample evidence of ongoing physical and verbal sexual and sex-based harassment that TEC allowed and encouraged over a period of at least eight years.

"Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Taylor v. Metro. Water Reclam. Dist.*, 15-CV-7855, 2020 WL 1503642, at *11 (N.D. Ill. Mar. 30, 2020); *Robinson v. Perales*, 894 F.3d 818,

828 (7th Cir. 2018). Sexist, sexual, or gender-based comments, when made on a regular basis, are sufficient to create a hostile work environment. *Passananti v. Cook Cty.*, 689 F.3d 655, 668 (7th Cir. 2012) ("There is no question that gender-based comments and epithets, when used pervasively in the workplace, can meet the standard for severe or pervasive harassment.").

A hostile work environment "depends on the totality of the circumstances, and the trier of fact must consider factors such as the conduct's frequency, its severity, whether it is physically threatening or humiliating, or whether it unreasonably interferes with an employee's work performance." *Id.; see Quantock v. Shared Mktg. Servs.*, 312 F.3d 899, 904 (7th Cir. 2002). "[H]arassing conduct does not need to be both severe *and* pervasive" to be actionable in a claim for hostile work environment. *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). Rather, "conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Id.*; *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) (holding that a supervisor's comments were sufficiently severe to create a hostile work environment where he made "at least eighteen sexist or sexual comments" within a period of ten months). Discrimination "need not involve sexual conduct;" it is enough to show that "the work environment was sexist." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018); *Rothschild Inv. Corp.*, WL 4164036, at *6 (Lee, J.) (where, over a 3-month period, employees made numerous sexist or gender based comments and touched plaintiff was sufficiently severe to survive summary judgment).

Defendants focus only on three incidents of harassment. However, Plaintiff has presented evidence on ongoing sexual harassment through monthly vulgar sexual requests, assaults, having her income removed by accounts being taken away, being belittled when she raised concerns, and

the other incidents of harassments that dramatically impacted Amy's health. SOAF ¶¶6-8, 10-21, 25, 26. The conduct here was both severe and frequent and should be decided by a jury.

### C. There Is Employer Liability Because TEC Was on Notice of the Harassment and Negligent in Remedying Harassment.

Defendants argue, wrongly, that TEC cannot be liable because Vince was not a supervisory employee and Amy did not sufficiently complain about the harassment. (Defs.' Mot. for Summ. J., 8). Defendant TEC is liable under Title VII whether or not Vince is a "supervisor" because there is sufficient evidence to show that it was on notice of open and notorious sexual harassment that continued for years. Contrary to Rule 56 standards, Defendants ignore that Amy was subjected to sexual harassment by multiple men, including President Mungo. SOAF ¶14.

TEC is liable if it was "negligent either in discovering or remedying the harassment." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011). "With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) 'knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.'" *See* 29 C.F.R. § 1604.11(d). As such, an employer still could be liable if it knew or should have known of the harassing conduct yet failed to act. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 799–800. In these cases, the employer is charged with having constructive notice of the harassment. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 478 (7th Cir. 2004). Generally, for constructive notice to attach, the notice must "come to the attention of someone who ... has under the terms of his employment ... a duty to pass on the information to someone within the company who has the power to do something about it." *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997). Once that person learns of the sexual harassment, the employer is on notice even if the victim never reported the harassment. *Cf. Hrobowski*, 358 F.3d at 478

("[A]n employer could be charged with constructive notice where the harassment was sufficiently obvious."). *Nischan v. Strat. Quality, LLC,* 865 F.3d 922, 931–32 (7th Cir. 2017).

The Record is replete with TEC management's actual knowledge (and participation) in the harassment and ignoring of complaints. SOAF ¶¶14-18, 21, 23, 24. President Mungo, who himself inappropriately kissed Amy early in her career, made it clear that no one would get in trouble because he headed human resources. SOAF ¶¶14, 21, 24. And, Amy did complain precisely how the Handbook says she should: she brought the harassment to "management's attention" and her "supervisor" (here, Amy complained Mertz and Kunz about the harassment)—and also much of it occurred in front of management. SOAF ¶¶14, 21, 27, 29. Nothing was done about her complaints--just like Olovich's email was ignored (and deleted) and just like Amy and others were told to deal with TEC just being a "boys club," as an excuse for the toxic environment. SOAF ¶¶7, 9. As TEC high-level management had constructive and personal knowledge of the ongoing harassment (and participated in it), its arguments are misplaced.

**III.  Equal Pay Act**.

Plaintiff agrees to voluntarily dismiss her state and federal Equal Pay Act claims.

**IV.  Plaintiff's Gender Violence Claim Is Timely**.

Plaintiff concedes that Vince's Las Vegas assault of Amy took place outside the Illinois Gender Violence Act's ("IGVA") seven-year limitations period. However, Amy's claims still are timely because 740 ILCS 82/5 allows claims within two years of "***a threat*** [of a battery] causing a realistic apprehension that the originator of the threat will commit the act." 740 ILCS 82/5 (emphasis added); 720 ILCS 82/20. A person commits battery if he "by any means …makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3.

Therefore, the question is whether a reasonably jury could find that after October 16, 2018, Vince made a threat of an insulting or provoking touching of Amy.

Vince had attempted to sexually assault Amy in the past, and he continued to threaten her on a regular basis thereafter, and therefore a jury could find that Amy had a "realistic apprehension" that she would be subjected to a touching of an insulting or provoking nature. When Vince said things to Amy like: "today's the day" or "let's go back into the bathroom and get this done" or "suck my dick," he was being both insulting and provoking as he was referring to unwanted sexual touching by him (as the aggressor) to Amy (as the victim). Amy reasonably considered Vince's continuing conduct as "stalking" and testified that: "I was pretty scared of [Vince]…he did this to me for over ten years at TEC." SOAF ¶21. As a result, she has PTSD and panic attacks and was scared he would touch her again. SOAF ¶21, 22. Certainly, given the prior sexual assault attempt, a reasonable jury could conclude that Vince's comments were threats of an insulting or provoking nature. Amy's reaction to Vince certainly was not unreasonable because "sexual assault victims often experience extreme fear and anxiety (including phobias), along with hypervigilance and/or a heightened startle response" after being attacked. Lonsway, Kimberly, PhD, *Victim Impact: How Victims are Affected by Sexual Assault and How Law Enforcement and Respond*, (Nov. 2020) at p. 19.[4] Amy and Urbanski both provided evidence that the harassment continued to occur during Amy's entire tenure at TEC. SOAF ¶¶14-21.

As to Count VIII, the IGVA claim against the corporate entity, Plaintiff acknowledges the Court's ruling in *Mundo v. City of Chi.*, 2021 U.S. Dist. LEXIS 144944 at *10-14 (N.D. Ill. Aug. 3, 2021). However, there is a split of authority on this issue including courts that have addressed *Mundo*. For example, *Boeving v. City of Collinsville*, 21-CV-00353-JPG, 2021 WL 5906087, at

---

[4] https://evawintl.org/wp-content/uploads/Module-2_Victim-Impact.pdf (Last Visited, February 28, 2022)

*3 (S.D. Ill. Dec. 14, 2021) recently examined *Mundo* and refused to dismiss a IGVA claim against a corporation and *Solinski v. Higher Learning Comm'n*, 1:20-CV-05236, 2021 WL 1293841, at *4 (N.D. Ill. Apr. 7, 2021) came to the same conclusion. *See also, Gasic v. Marquette Mgmt., Inc.*, 2019 IL App (3d) 170756, ¶ 17 (in a split decision, finding that a corporate entity can be liable under the IGVA); *Smith v. Rosebud Farmstand*, 909 F. Supp. 2d 1001, 1009 (N.D. Ill. 2012) (allowing IGVA to go forward where supervisors had received complaints of harassment and took no action to stop them).

*Mundo,* the IGVA's plain language, and the cases that have respectfully not followed *Mundo* can be harmonized here by focusing on whether the corporation itself personally encouraged or assisted the acts of gender-related violence. TEC should be held liable directly for its role in encouraging (through its agents) the acts against Amy. Unlike the *Mundo* case, the Defendant here is a closely held corporation where the main assailant (Vince) is also a shareholder and best friend of the owner and one of the assaults occurred right in front President Mungo who blessed everything by making it clear that this behavior was allowed because he was the head of human resources. SOAF ¶¶2, 14. When the captain of the ship (Mungo) displays such behavior, it of course encourages others to do so as well. The unique facts of this case warrant allowing the IGVA to proceed against TEC. The IGVA should stand in its entirety.

## V. The Record Supports Plaintiff's Sex Discrimination Claims.

### 1. Plaintiff's claims are timely.

As detailed above in the harassment section, the claims here too are timely. Plaintiff incorporates by reference her response in Section IA.

### 2. Amy Suffered an Adverse Action.

The Defendants argue that Amy did not suffer from an adverse action. (Defs.' Mot. for Summ. J., 13-14) An employee must show "some quantitative or qualitative change in the terms or conditions of [her] employment or some sort of real harm." *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014). Amy suffered an adverse action when she was terminated, had accounts taken away from her, when accounts were not assigned to her (even though the customers specifically asked for her), when Mertz told her that she could not follow the "open door" reporting policy after being told she could not go on the ABT tour, and when she was not made a shareholder. SOAF ¶¶10-13, 25, 29, 34.

Defendants' cursory two sentence argument that Amy failed to exhaust her administrative remedies because termination was not included in the EEOC charge is false and frivolous. Amy's EEOC charge expressly includes "sex discrimination and retaliation" and "being terminated" and the boxes for "sex" and "retaliation" are checked.[5] As such, Plaintiff can proceed on all her claims.

### D. Plaintiff Identified Other Similarly Situated Workers but This Is Not Required.

On page 15, the Defendant argues summary judgment is warranted because the Plaintiff did not identify any similarly situated co-worker. (Defs.' Mot. for Summ. J., 15). To survive summary judgment, however, it is no longer necessary to identify a similarly situated co-worker. *See,* Exhibit 1, *Rice v. Universal Beauty Products, Inc.*, No. 1:19-cv-01378, at *15 (N.D. Ill. Sept.

---

[5] Assuming arguendo that it had not been included, "Courts review the scope of an EEOC charge liberally, and a Title VII claim can be brought in federal court if it is like or reasonably related to the allegations of the EEOC charge and growing out such allegations." *Flanagan v. Excel Staffing Sols., LLC*, No. 16-CV-05653, 2018 WL 558499, at * 5 (N.D. Ill. Jan. 1, 2018). To be deemed reasonably related, "the allegations must have a factual relationship and describe the same conduct and implicate the same individuals." *Id.* Here Mertz subjected her to differential treatment because of her sex when he told her she could not attend the ABT factory tour because she is a woman SOAF ¶8, told her she could not complain to Mungo SOAF ¶29, would not allow her to have accounts that requested her SOAF ¶13, and created pretextual reasons to terminate her SOAF ¶¶30-39. These allegations would likely have developed evidence that Amy was also terminated due to her being a woman—especially since other males in her position were not let go and did worse or similar things than what Mertz accused her of.

28, 2021) (Lee, J.). ("Because *Ortiz* applies equally to retaliation claims, [a plaintiff] need not identify a similar situated worker" at all). *Id.* ([A]lthough the termination occurred two months after a complaint was made, a jury could conclude that the supervisor found out about complaint).

In the event a similarly situated worker is required, "the similarly-situated inquiry is a flexible, common-sense one . . . but it at least requires that the plaintiff name a comparator of her protected class. *Arizanovska v. Wal-Mart Stores, Inc.,* 682 F.3d 698, 703 (7th Cir. 2012). A court can "perform a "common-sense factual inquiry" to determine if there are enough common features between two individuals to allow [for] a meaningful comparison." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007); *Johnson v. Advocate Health.*, 892 F.3d 887, 895 (7th Cir. 2018) ("is a search for a substantially similar employee, not for a clone.").

Here, Urbanski worked as a TM for approximately the same amount of time as Amy. He lost five customers and was never disciplined. SOAF ¶31. Other male TMs lost larger accounts than the ones Amy allegedly lost and were not terminated, like Scott Vanderwiel who lost one of TEC's largest customers. SOAF ¶31. Also, there were a number of male TMs who regularly missed mandatory meetings and were not written up. SOAF ¶36. In fact, Vince stopped attending residential meetings altogether. *Id.* Additionally, other male TMs engaged in poaching and were not reprimanded or disciplined, whereas Amy was falsely accused of doing so only because she belonged to the same woman's group as these customers. SOAF ¶37. Furthermore, aside from Amy, TEC's other residential TMs were men, and she performed better than them according to the criteria used for the President's Award, but Amy was the only one fired for allegedly having performance issues. SOAF ¶3.

## VI.    The Record Support's Amy's Retaliation Claim.

### A.  Plaintiff Engaged in Protected Activity.

Defendants argue that Amy only complained in "general terms" about discrimination and harassment and that this does not constitute protected activity. (Defs.' Mot. for Summ. J., 16). Over a period of many years, and particularly during 2020, Amy complained about being treated differently from her fellow male TMs because she was a woman. SOAF ¶¶8, 25-29.

A "wide variety of employee conduct can constitute protected activity for anti-retaliation purposes." *Kotoklo v. DePaul Univ.,* 20-CV-0635, 2021 WL 4477947, at \*13 (N.D. Ill. Sept. 30, 2021). "Although an employee need not use the magic words "sex" or "gender discrimination" to bring her speech within Title VII's retaliation protections, "she has to at least say something to indicate her [gender] is an issue." *Sitar v. Indiana Dept. of Transp.,* 344 F.3d 720, 727 (7th Cir. 2003); *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (citation omitted) (an informal complaint must be about discrimination or there must be "sufficient facts to raise that inference."); *Melton v. Five Four Corp.,* No. 99 C 1274, 2000 WL 97568, at \*11 (N.D. Ill. Jan. 25, 2000) (complaining to a manager about discrimination at the workplace constitutes statutorily protected activity); *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 770 (7th Cir. 2008) (prior gender related complaints combined with newer general complaints about management skills viewed together show protected activity). When a plaintiff who has "a long history of raising concerns about discrimination" is asserting a claim, "her claims must be viewed through that lens" and in light of her protected activity. *Sumi Cho v. Rosato Perea,* 18 C 8117, 2019 WL 4645419, at \*9 (N.D. Ill. Sept. 24, 2019) (Lee, J).

Opposing sexually harassing behavior in and of itself is activity protected by § 2000e–3(a) because "the victim of harassment should not fear retaliation if she resists sexually predatory

behavior by colleagues or supervisors." *See Armbruster v. Epstein and Regal Corrugated Box Co.,* 1996 WL 289991, at *3 (E.D. Pa. May 31, 1996) ("[R]efusing sexual advances itself should be viewed as protected conduct under anti-discrimination law, for which employees should not be made to fear retaliation."). Complaining about discriminatory account transfers is also protected. *See, Reszetylo v. Morgan Stanley Dean Witter & Co.*, 84 Fed. Appx. 822, 824 (9th Cir. 2003) (plaintiff "engaged in protected activity; she complained …about perceived gender discrimination in account transfers").

Amy's complaints were specific that she was having accounts taken away from her on the basis of gender, she was treated differently than men with respect to the ABT tour, her supervisors were discriminating against her, she was being sexually harassed and, that there was "sexism" at TEC, and when she reported to Kunz in 2020 about her supervisor's sexist comments. SOAF ¶¶8, 25-29.

### B. A Reasonable Jury Could Conclude Defendant Terminated Amy Because of Her Protected Activity.

There are many different reasons a jury could conclude that Amy's termination was caused by her protected activity. "[T]here is no bright-line rules to apply when considering the temporal proximity of adverse actions to protected activities because it is a fact-intensive analysis." *Hicks v. Forest Pres. Dist. Of Cook Cty.*, 677 F.3d 781, 789 (7th Cir. 2012). "The mere passage of time is not legally conclusive proof against retaliation." *Malin*, 762 F.3d at 559 (reversing the lower court's decision to grant summary judgment and finding that a passage of three years between an employee's initial complaint and the retaliatory conduct was not enough to bar any inference of retaliation). "[T]here are cases in which a plaintiff can demonstrate causation despite substantial lag time." *Baines v. Walgreen Co.*, 863 F.3d 656, 666 (7th Cir. 2017); *Reszetylo,* 84 Fed. Appx. at 825 (9th Cir. 2003) ("the fact that [defendant] fired [plaintiff] four months after she complained

about gender-based discrimination supports an inference of retaliation sufficient to satisfy the causation element.").

Where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to inference of retaliation. *Kielczynski,* 122 F. Supp. 2d at 945 (N.D. Ill. 2000); *see also Sitar,* 344 F.3d at 728–29 (7th Cir. 2003) (holding that plaintiff offered sufficient evidence of causation in support of retaliation claim where evidence showed that plaintiff's manager was "visibly upset" by the plaintiff's formal complaint of sex discrimination against him, even though the complaint was lodged more than three months before the adverse employment action in question); *See, Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 311 (3rd Cir. 2012) (finding timing pertinent to pretext even though performance issues had basis in fact where issues were known prior to taking leave, but employee terminated only after taking leave).

When an employee is performing well, according to employer-determined criteria, this too weights in favor of finding a factual dispute precluding summary judgment. *Sempowich v. Tactile Sys. Tech., Inc.,* 19 F.4th 643, 653 (4th Cir. 2021) (reversing summary judgment because while courts defer to business judgment for evaluation, plaintiff met metrics employer used); *Culver v. Gorman & Co.,* 416 F.3d 540, 546 (7th Cir. 2005) (causation element satisfied in part because plaintiff's most recent review was satisfactory). Moreover, when an employee generally performs well and then is suddenly disciplined, this is evidence of pretext. *See generally, Morales v. Merit Sys. Prot. Bd*., 932 F.2d 800 (9th Cir. 1991) (precipitous decline, where a plaintiff performs well for a number of years and then is written up, or demoted or fired, can indicate pretext.). *Hilde v. City of Eleveleth,* 777 F.3d 998, 1008 (8th Cir. 2016).

A jury could believe that Mertz told a co-worker that Amy could not be fired because of her gender-based complaints, so he knew he had to come up with a pretextual reason. SOAF ¶40. A jury could also find that his statement that she was a "firecracker waiting to explode" is indicative of a female who speaks her mind (*i.e.*, does not want to be sexually harassed or discriminated against). *Id. See, 11 Words We Need to Stop Using to Describe Women*, (noting that the #6 word not to call a woman is a "firecracker" because "when a man speaks his mind or goes after what he wants, he's just being a normal person. When a woman does, she's a firecracker").[6]

The reasons for termination were demonstrated false and/or exaggerated. SOAF ¶¶30-39. Furthermore, in context, Amy had just landed a major account and won the President's Award and was the number one TM at TEC based on criteria set by the employer so her termination, particularly at that time, makes little sense. SOAF ¶3. Amy's customers loved her and was not at fault for them reducing her orders (and other TMs had lost customers), Ottoman had authorized for her to organize the ABT tour, and this demonstrates pretextual reasons. SOAF ¶31, 32, 33. *See, Jackson v. Aulick Chem. Sols., Inc.*, 5:16-CV-452-JMH, 2018 WL 310139, at *6 (E.D. Ky. Jan. 5, 2018) (denying summary judgment where employer claimed termination supported because of loss of large customer, but plaintiff introduces evidence that he was not "not the reason" the customer left, then "it would make little sense for him to be fired for the loss of that customer.")

Defendants' false and suspicious reasons casts doubt on the sincerity of reasons for terminating Plaintiff. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 147 (2000) ("a jury can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about material fact as

---

[6] https://www.bustle.com/articles/150273-11-words-we-need-to-stop-using-to-describe-women-because-housewife-doesnt-capture-anyones-job

'affirmative evidence of guilt."); *Fischer v Avanade, Inc.,* 519 F.3d 393, 403-04 (7th Cir. 2008) (plaintiff can withstand summary judgment based on "fishy and suspicious nature of defendant's reasons).

So long as Amy put up with the harassment, TEC was willing to make an exception to its rule of not hiring women as a TM. But, when she became a "firecracker" they had to put her out before she caused damage. *Rothschild Inv. Corp.*, 2017 WL 4164036, at *11 (finding that comment about not feeling comfortable with a woman when hired can relate to evidence of sex discrimination for termination)

After Amy reported discrimination to Mertz, he warned her not to complain to others, but she still did (SOAF ¶29), and this animus supports a discriminatory intent. *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) (where plaintiff warned not to complain to supervisor and does anyway, this along with other evidence that "creates a triable inference that her complaints of discrimination were a substantial and motivating factor in her termination.") At termination, Amy was told she did not do anything wrong. SOAF ¶30. *See, Id. at* 548 ("This failure to earlier mention the incident as a reason for termination is evidence of pretext"). As such, there is sufficient evidence to allow a jury to determine that there is causation. And, finally, Mertz's admission that Amy could not be fired because of her gender-based complaints, while inquiring about how long she would "stick around" is direct evidence that he needed to come up with pretextual reasons. SOAF ¶40.

## **CONCLUSION**

Wherefore, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgement, set this matter for trial, and for all other relief that this court finds just and proper.

Dated: March 4, 2022                          Respectfully Submitted,

                                              By: /s/ David Fish
                                              One of Plaintiff's Attorneys

David J. Fish
Thalia Pacheco
FISH POTTER BOLAÑOS, P.C.
200 E. 5ᵗʰ Ave., Suite 123
Naperville, IL 60563
dfish@fishlawfirm.com
tpacheco@fishlawfirm.com
docketing@fishlawfirm.com


## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of March 2022, I electronically filed the foregoing **Plaintiff's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment** with the Clerk of Court using the CM/ECF system, which will send notifications of such to the counsel of record.

                                              By: /s/ David Fish
                                              One of Plaintiff's Attorneys