## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AMY MORAVICK,

        Plaintiff,

        v.

TEMPERATURE EQUIPMENT CORP.
and VINCE DESTAFANO,

        Defendants.

Case No. 20-cv-6188

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Amy Moravick worked as a Territory Manager ("TM") for Defendant Temperature Equipment Corporation ("TEC"), a distributor of HVAC/R products throughout the Midwest. In that capacity, she handled residential sales for TEC from 2009 until May 13, 2020, when TEC fired her. Five months later, she sued TEC and Vince DeStefano, another TM, claiming sex discrimination and sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and violation of the Illinois Gender Violence Act ("Gender Violence Act"), 740 Ill. Comp. Stat. 82/1 et seq.; she also alleged retaliation. Defendants now move for summary judgment on all claims, [68]. For the reasons explained below, this Court grants in part, and denies in part, Defendants' motion.

I.      **Factual Background and Procedural History**[1]

TEC distributes HVAC/R products throughout the Midwest and is the exclusive distributor for Carrier Corporation in the Chicagoland area. Plaintiff joined the company in December 2009, and worked as a Territory Manager in TEC's residential division until May 13, 2020, when TEC fired her. In that entire time, Plaintiff was the only female TM in the residential division.

Defendant Vince DeStefano also worked as a TM at TEC; he started at the company in 1978 and was thus there when Plaintiff arrived and remained after she was fired. DeStefano is friends with Raymond "Skip" Mungo, TEC's president and CEO; DeStefano stood up in Mungo's wedding.

During the course of her employment, Plaintiff experienced what she claimed was discrimination and harassment based upon her sex; she also claims she was sexually harassed by DeStefano.

Plaintiff testified that TEC treated men differently than women with respect to account assignments and transfers; for example, TEC transferred the Comfort Level account to her, and when the company said it wanted to stick with its male TM, TEC accommodated that request. [70-2] at 17. Yet, when Plaintiff "was on the opposite side of that and an account said hey, we don't want to lose Amy as our Territory manager, they would still make the account transfer to the new TM" *Id*. She testified, with regard to transfers, "in the situation where that would happen

---

[1] The Court draws these facts from Defendants' statement of facts [70], Plaintiff's response thereto [72], Plaintiff's statement of additional facts [74], Defendants' response thereto [78], and the exhibits attached to each of these statements.

2

with me, I was forced to give up an account even though the relationship was strong, and the males were typically just given the account that circumstance happen. So it all revolves around the circumstance of, you know, an account is being transferred and now they want the existing TM that they have, right?  And the males were treated differently than I was in that process." *Id.* at 18.

She also testified that her supervisor, Chad Mertz, disciplined her for failing to attend the second day of a sales training when she had a legitimate medical issue and only about 30% of the team attended the first day. *Id.* at 21.  She attended most of the trainings during her tenure at TEC "versus other Territory managers" who were never "there at the so-called mandatory trainings." *Id.* at 22.  Plaintiff testified, however, that Mertz also wrote up Jason Urbanski for missing the training. *Id.* at 22.

Plaintiff testified that Mertz was unprofessional, disrespectful, and mean to her. *Id.* at 22–23.  She testified that several accounts requested her as their TM— Builders Heating, Sun Ray Mechanical, Chris Mechanical, Jacobazzi Heating & Air Conditioning, Ameritemp Equipment Services—and TEC never assigned those accounts to her; instead, Chad Mertz told her to stop poaching accounts. *Id.* at 24.  Plaintiff testified that Roberts Heating asked to have her removed as their TM because the owner was a "chauvinistic pig" and "didn't want a woman as his TM"; yet TEC supported that decision. *Id.* at 32.  TEC took the account away from her and failed to assign a replacement account, which affected her compensation. *Id.*

Plaintiff also testified that, in 2020, Jim Ready, a high performing TM, retired,

and all of his accounts were given to male TMs; and, even though she was coming off a high-performing year, she did not get a single account from Jim Ready's list in 2020. *Id.* at 33. She testified that there was no legitimate reason to not give her those accounts, except that she is a woman. *Id.* She testified that accounts were doled out in a discriminatory manner: "the males were given more opportunities than I was and more profitable opportunities, larger contractors, not ones that, you know, I was given the ones with credit problems." *Id.* She testified that she "really was a high performing Territory Manager for TEC, and I was just kept down at a certain level never able to make the same money the men did." *Id.* at 34. She also testified that Jay DeStefano and Adam Tolan were afforded better opportunities that she was. *Id.* She testified that she was not afforded the same opportunity as a male at that company and that the company told her she was a woman in a man's industry, a boy's club. *Id.* at 35.

She testified that she "was one of the top acquisitioners for TEC bringing in new business; but, at the same time I was bringing in new business, accounts were being moved away and not replaced. So my territory was constantly staying around three million dollars with those changes." *Id.* at 47.

She testified that TEC treated her differently because she was a woman and that "there was favoritism and nepotism within that company. You had best friends, family. A lot of family members. A lot of ex-girlfriend's brothers, sisters, cousins; people related in the company. So you had a lot of that going on based on the perception of many employees at TEC." *Id.* at 48. She testified that male TMs lost

4

accounts and were not fired—Jason Urbanski, Scott Vanderweil, Chris Vanderweil, Davis Stefenil. *Id*. at 48. Yet she was supposedly fired for losing accounts.

When pressed, Plaintiff clarified that she does not allege that Chad Mertz, Mike Smid, or Jim Ottoman engaged in sexual harassment, [70-2] at 38, but she does allege that Mertz discriminated against her on the basis of sex. Specifically, she claims that, in January 2020, he told her she could not go the ABT factory because she was a woman. *Id*. at 38–39. Mungo testified that Amy set up the meeting with ABT, which would have been a lucrative account, bringing in potentially $2 to 3 million, [70-1] at 9. She complained to Jim Ottoman that Mertz wanted to exclude her because of her sex. [70-2] at 39. She also testified that Mertz bullied and harassed her and, when she complained to him about sexist bullying and harassment, he did nothing about it. *Id*. at 40. She testified that she "complained to Chad about the sexist environment, the bullying environment, the harassment, the sexual harassment, and Chad really had no reaction to that as a manager." *Id*. at 56.

Plaintiff testified that her supervisors treated her less professionally than they did her male counterparts; they told her she was "just a woman" and that "the women's social function was a work function," demeaning "everything that had to do with a woman"; in her "performance review" she was berated and told to "get ready for an ass whipping." *Id*. at 42. She testified that she complained to Jim Ottoman about account assignments three or four times during her tenure at TEC. [70-9] at 12.

Plaintiff also testified that Vince DeStefano made sexual comments and sexual

gestures to her throughout her tenure at TEC, and that Skip Mungo kissed her on the cheeks and lips at meetings in her earlier years at TEC (she said Mungo stopped in 2014 or 2105). [70-2] at 49–50. DeStefano told her she looked hot and asked her if she wanted to "suck his dick." *Id.* at 50–51. She testified that DeStefano made vulgar, sexual comments to her pretty much any time she ran into him. *Id.* at 52.

Finally, Plaintiff testified that Vince DeStefano sexually assaulted her in Las Vegas at an off-site sales meeting in October of 2012; this was the only time the harassment became physical. *Id.* at 49–50. She said DeStefano stalked and followed her in Vegas and tried to put her hand on his crotch. *Id* at 53. She testified that she did not complain to HR about Vince because he was "untouchable"—he was one of Skip Mungo's best friends, and she knew that if she complained about him, she would lose her job. *Id.* at 54. She testified that Skip used to joke that he was the "head of HR" so she did not feel comfortable complaining to HR; she testified that the culture was toxic and it all started "from the top down": Skip joked about sexual harassment training so no one took it seriously. *Id.* at 57. Chad Mertz and Michael Smid both confirmed that Skip would often say he was in charge of HR or the head of HR. [70-7] at 43; [70-8] at 4.

Jason Urbanski, another TM, confirmed the "culture" of "toxicity" at TEC. [70-9] at 4. He testified that TEC transferred and reassigned accounts, not based upon a particular TM's performance, *id.* at 10, but based upon the decisions of Skip Mungo, Mike Smid, and a couple of commercial sales managers. *Id.* at 10–11. Urbanski also confirmed that TEC treated different TMs differently. *Id.* at 11. He testified that

6

management did not assess skill sets, but assigned accounts based upon favoritism and nepotism; accounts were handed out based upon "relationship with management." *Id.* at 11, 25. Urbanski testified that he lost five accounts during his 11 years at TEC, but was not fired for it (and, by "lost" he means that the customers decided that they no longer wanted to deal with TEC; the departure had nothing to do with him or his performance). *Id.* at 12–13.

Urbanski also testified that, in his view, Plaintiff suffered harassment at TEC. [70-9] at 20. With regard to the October 2012 sales meeting in Las Vegas, Urbanski testified that he attended, as did Plaintiff; he testified that, late one night a group of people were sitting around drinking, including him, Plaintiff and Vince DeStefano and others. *Id.* at 27. He testified that he watched Vince try to pull Plaintiff's hand by the wrist a couple of times onto his crotch and did not see Plaintiff make any moves toward DeStefano. *Id.* at 28. Urbanski testified that, despite reports to the contrary, Plaintiff did not lift her shirt to expose her breasts; nor did he see her flirting with men at the bar or at casino tables. *Id.* Urbanski testified that Skip Mungo observed DeStefano's conduct, as he was sitting right there. *Id.* at 29.

Urbanski also testified that he witnessed DeStefano talking to Plaintiff about the size of his penis. *Id.* at 29. He testified that he observed "Vince trying to pull Amy's hand towards his crotch a couple times and I remember Amy looking uncomfortable and trying to laugh it off, and made a comment similar to, you know, 'Please, don't even' -- you know, 'Don't even pull me towards that little thing,' and I -- trying to defuse the situation and get it to stop, and Vince's reply was, 'It's not small,

7

you're not going to be disappointed. Here, grab a feel on this,' something similar to that." *Id.* In response, Plaintiff attempted to move away from DeStefano. *Id.* at 31. Urbanski also testified that, the same evening, while a group of meeting attendees were gambling and playing poker, he witnessed Skip Mungo "grab Amy around the waist and pull her onto his lap while he was gambling at the table." *Id.* at 32. Urbanski testified that, the next morning, Plaintiff relayed to him that, after she went to bed, DeStefano called her and asked her to come back down to hang out with the group; she went and he pushed her into a side room and tried to get her to perform oral sex on him; she got past him and left. *Id.* at 33. Urbanski asked Plaintiff how she was and what she planned to do about DeStefano's behavior, and she responded that she wasn't sure but was afraid to bring it up "for fear of her job." *Id.* He observed that Plaintiff was "confused and unsure and worried for her job." *Id.*

Urbanski testified that this was not the only time he witnessed DeStefano behave inappropriately toward Plaintiff. In 2015, at a sales meeting in Lansing, he overheard DeStefano say to Plaintiff, "Why don't we go into the bathroom together so you can fuck me?" And, on several occasions throughout 2017 he saw DeStefano grab himself and gesture at Plaintiff, "giving her the nod"; he also made comments like "Let's go into the women's bathroom," or "'Let' -- again, going, 'Women's bathroom,' or 'Let's go back into the bathroom and get this done,' or 'Today's the day,' or -- or something like that. It wasn't specifically saying, 'Sex' or 'Oral sex,' but you know, more of a general, 'Today's the day' type thing. Just disgusting." *Id.* at 35. Urbanski testified that, in 2018, at a meeting in Melrose Park, he heard DeStefano call to

Plaintiff as he was walking to the bathroom, suggesting that she go with him to perform oral sex on him. *Id.* at 36. Urbanski recalled that DeStefano said something to the effect of, "I need a blow job," "Come give me a blow job," "I -- I want a blow job," but "it was something referring to, 'I need,' 'I want,' or 'I should have,' or 'You should.'" *Id.* at 36. Urbanski could not recall the exact words but was "100 percent sure I know he -- what it was … a general request for oral sex and the words 'blow job' were used." *Id.* Urbanski testified that, in response to this, Plaintiff "said, 'You have to stop doing this,' and then looked at Vince's brother, John, and said, 'You need to get him to stop doing this. This is out of control.'" *Id.* at 37.

Urbanski testified that, when he witnessed these encounters, he would tell Plaintiff he could not believe she had to deal with such behavior or that he thought it was ridiculous that this continued to happen. *Id.* at 33, 36. Urbanski admitted that he did not report these incidents to HR. He testified that, although he thought it was very important that these incidents be brought to the attention of TEC management or TEC HR, he did not report anything because he too feared for his job: "when you work at a company where the best friend of the person who seems to be committing these things continually tells you that he's the head of human resources, and that all things either get squashed or end up with him, I did not feel confident, number one, that anything would be done, and number two, I am the main provider for my family and feared for my job had I brought this information forward." *Id.* at 36–37.

Urbanski also observed that TEC took one of Plaintiff's accounts away "based on her gender." *Id.* at 37. Urbanski testified that TEC took the account away from

her because the customer did not want a woman TM, and then "Amy was not reloaded or recompensated for having that account taken from her." *Id.* at 38. Urbanski also testified that TEC told Plaintiff that "she couldn't go down to the Bryant factory with a new dealer she had signed up because she was a woman and [TEC] didn't want a woman down there alone with contractors." *Id.* at 39.

Finally, when asked if he wanted to add anything to his testimony concerning evidence of harassment, Urbanski testified,

> I don't know if the nature of the boys' club comments that are made are specifically geared towards gender bias or sexism towards Amy or women in general, so I'm not really quite sure how to answer that question. I would say there's been multiple comments over the years when disparaging things were said towards women or about women in meetings, in group settings, which I would absolutely consider to be discriminate -- discriminatory in nature. . .Yes, I, over the years, have witnessed multiple sexist-based comments in meetings that Skip Mungo had to stand up to defuse, and -- by saying, "Hey, that's enough, that's enough, it's a good thing I'm the head of human resources," as these comments were made.

*Id.* at 41.

With regard to the account reassignments, TEC President Skip Mungo testified that he was aware that Roberts Heating asked to have a TM other than Plaintiff on its account; he knew Plaintiff thought it was because she is a woman, but he was told that was not the case; the owners just wanted a different TM. [70-1] at 15. But Jim Ottoman testified that the Roberts account was reassigned because of "a personality conflict" after the customer indicated that Plaintiff "wasn't a fit within their – their organization." [70-12] at 15. At the customer's request, TEC thus transferred the account from Plaintiff to a male TM. Yet, when customers asked to

have Plaintiff assigned to their accounts—particularly customers like Chris
Mechanical and Jacobazzi, who came to know Plaintiff through the Bryant Women
in HVAC Program—TEC accused her of "poaching." Chad Mertz confirmed that
Chris Mechanical requested Plaintiff and that he viewed this as poaching, an offense
warranting termination. [70-7] at 12. Mertz also agreed that Chris Mechanical's
current TM was in fact handling the account in a subpar way, a way that needed
improvement. *Id.* at 13. Mike Smid testified that the incident Mertz described as
"poaching" involved Jacobazzi requesting Plaintiff as their TM in lieu of Keith Shires.
[70-8] at 16.

TEC fired Plaintiff on May 13, 2020. Skip Mungo made the ultimate call to
approve her firing, but Chad Mertz furthered the action. Mertz testified that he
thought about firing Plaintiff when "the poaching instance with Chris Mechanical"
occurred in October 2019 and that he finally decided to fire her in March or April of
2020, "when the Orange Homes Services thing was unsavable, and the customer's
reason for leaving was unacceptable." [70-7] at 12. Mertz also testified that he fired
Plaintiff for insubordination, *id.* at 27, for going over his head and talking to Skip
Mungo (though he could not remember what she talked to Skip about and he
acknowledged that Skip had an express open-door policy). *Id.* at 27–28. Mertz also
testified that one of the instances of insubordination involved Plaintiff yelling at him
"about the account assignments for Jim Ready." *Id.* at 30. Mertz testified he fired
Plaintiff for insubordination, for poaching, and for losing two larger accounts,
Effective Air and Orange Home Services. *Id.* at 31. Mertz testified, however, that

11

neither account said Plaintiff had done anything wrong. *Id.* And Brian Zilly, TEC's HR manager, testified that there's nothing wrong with an employee going to Skip. [70-13] at 16.

Mungo similarly testified that TEC fired Plaintiff because the sales guys were not pleased with her performance and specifically her failure to make management aware of issues with the Orange Home Services account. [70-1] at 13. Mungo testified that TEC lost the Orange Home Services and Effective Air accounts in part because of Plaintiff. *Id.* at 11–12. But he also testified that both customers left TEC "over pricing"; and he testified that, when he called Orange Home Services to find out what was going on, they said they were happy with Plaintiff and that it was not her fault they were leaving. *Id.* at 12.

Plaintiff filed a charge of discrimination with the Illinois Department of Human Rights and the EEOC on June 6, 2020.[2] In her charge, Plaintiff claimed that she was "subjected to sex discrimination and retaliation, including unfair and unequal terms of employment and pay. I was subjected to a sexually harassing work environment. I opposed sex discrimination, unequal terms of employment, retaliation, and sexual harassment, and was retaliated against as a result, including being terminated." [1-1] at 2. The EEOC issued a right-to-sue letter on October 2, 2020, and Plaintiff sued TEC and DeStefano on October 16, 2020, alleging sexual harassment and discrimination in violation of Title VII (counts I and II), retaliation

---

[2] The charge appears to be dated June 2, 2020, [1-1] at 2, but the parties agree that Plaintiff filed the charge June 6, 2020. *See* [72] at 2.

in violation of Title VII (count III), and violation of the Gender Violence Act (counts VIII and IX).[3]

Defendants now move for summary judgment on all claims. *See* [68].

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the

---

[3] In response to Defendants' initial motion, Plaintiff agreed to voluntarily dismiss her state and federal Equal Pay Act claims. *See* [49] at 20. And the Court thus dismisses counts IV, V, VI, and VII pursuant to Rule 41(a)(2).

non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Analysis

In their motion, Defendants argue that Plaintiff's discrimination, harassment, and gender violence claims are barred by the statute of limitations; that the record shows Plaintiff suffered no adverse action; that the record contains no evidence to support a claim of discrimination; that Plaintiff offers no evidence of similarly situated male employees being paid more based upon their gender; and that Plaintiff did not engage in any protective activity to support her retaliation claim. *See* [68]. The Court considers each argument in turn below.

### A. Statute of Limitations

#### 1. Plaintiff's Title VII Claims

Plaintiff asserts three claims against TEC under Title VII: sexual harassment (count I); sex discrimination (count II); and retaliation (count III). TEC argues that all claims are untimely.

A plaintiff in Illinois who wishes to bring a Title VII claim in federal court must first file an administrative charge with the EEOC within 300 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(e); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014); *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999); *Lorance v. AT & T Techs., Inc.*, 827 F.2d 163, 165 (7th Cir. 1987), *aff'd,* 490 U.S. 900 (1989). Failure to file a charge within that time renders the claim untimely. *Hentosh*, 167 F.3d at 1174. When "discriminatory conduct occurs outside of the 300–day limitations period, a

14

Title VII plaintiff may still proceed in court if she is entitled to equitable tolling, *see Hentosh*, 167 F.3d at 1174 ("The timely filing of an EEOC charge is not a jurisdictional prerequisite to filing a federal lawsuit, but rather, is more akin to a statute of limitations and subject to waiver, estoppel, and equitable tolling under appropriate circumstances."), or if, under the continuing violation theory, the alleged conduct has a sufficient connection to a discriminatory act that took place within the limitations period," *see Brown v. United Airlines, Inc.*, No. 15 C 2751, 2015 WL 5173646, at *1–2 (N.D. Ill. Sept. 2, 2015) (citing *Place v. Abbott Labs.*, 215 F.3d 803, 807 (7th Cir. 2000)).

Because Plaintiff filed her EEOC charge on June 6, 2020, any claims prior to August 12, 2019 are barred by Title VII's 300-day statute of limitations. Plaintiff alleges that both Skip Mungo and Vince DeStefano interacted with her physically during her time at TEC. She testified that Skip Mungo kissed her on the lips and cheeks at meetings, and she testified that Vince DeStefano grabbed her during a meeting in Las Vegas. [70-2] at 49. But the record shows that the Vegas incident occurred in 2012, and Plaintiff testified that Skip Mungo's unwanted physical attentions ceased in 2014 or 2015, *id.* at 49–50, suggesting that Defendants are correct about the statute of limitations.

Plaintiff claims that she can take advantage of the continuing violation doctrine because DeStefano made sexual comments and gestures throughout her tenure at TEC. [70-2] at 49. If a plaintiff "alleges 'continuing violations,' which constitute a pattern and practice of discrimination, we may look outside of the

relevant time period." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir. 2004). The Supreme Court has explained that the "continuing violation doctrine" precludes recovery for "discrete acts of discrimination or retaliation that occur outside the statutory time period," but permits "'consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period,…for the purpose of assessing liability, *so long as an act contributing to that hostile environment takes place within the statutory time period.*'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002)) (emphasis added).

Plaintiff's statement that DeStefano's comments continued throughout her tenure remains insufficient to trigger the continuing violation doctrine.[4] Plaintiff provided no evidence of any comments within the statutory period, and thus the record contains no way to test their content and find them discriminatory or harassing. As a result, the Court finds that she has failed to provide sufficient evidence of harassment during the limitations period, and her sexual harassment claim is thus time-barred. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (Observing that, because a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,' . . . the employer may be liable for all acts that are part of this single claim." But, for the charge to be timely, "the employee need only file a charge

---

[4] Moreover, evidence of half a dozen vulgar comments over the course of more than a decade remains insufficient to sustain even a timely hostile environment claim. *See Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004) ("Offhand comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim.") (citing *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).

within 180 or 300 days of any act that is part of the hostile work environment." In contrast, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges").

Plaintiff provides specific testimony concerning some of the comments DeStefano made, describing the exact content of his remarks and the place and time of delivery. All of those comments, however, occurred outside the statute of limitations period. When counsel pointed this out, Plaintiff denied the point, stating that "it happened at all of our sales meetings, dealer meetings . . . . If I ran into him, that's when it happened. The only time it didn't happen is if I didn't run into him, or he didn't stalk me down, or if he or I simply wasn't at the meeting." *Id.* at 52. Nevertheless, on the record, she failed to describe any comment made within the statute of limitations period, and her testimony falls short of demonstrating, beyond a speculative level, that any actionable act of harassment occurred during the limitations period. As a result, the continuing violation doctrine cannot save Plaintiff's harassment claim.

Plaintiff has also alleged discrimination, however, based upon discrete discriminatory acts within the 300-day window. Plaintiff claims that Chad Mertz denied her the opportunity to be present during a factory tour, reassigned one of her accounts because the customer did not want a woman TM, treated her differently with respect to account assignments, unfairly disciplined her, and, ultimately, fired her—all in 2020. Although these acts differ in character from, and appear to be unrelated to, DeStefano's overt harassment, they nonetheless support a timely

discrimination claim, and the Court will consider Defendants' substantive arguments about Plaintiff's Title VII discrimination claim below.

## 2.    Plaintiff's Gender Violence Act Claims

The Illinois Gender Violence Act provides that any person who has been "subjected to gender-related violence as defined in Section 5 may bring a civil action for damages, injunctive relief, or other appropriate relief against a person or persons perpetrating that gender-related violence." 740 Ill. Comp. Stat. 82/10. The Act defines "gender-related violence" to mean: (1) one or more acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's sex, whether or not those acts have resulted in criminal charges, prosecution, or conviction; (2) a physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery under the laws of Illinois, whether or not the act or acts resulted in criminal charges, prosecution, or conviction; and (3) a threat of an act described in item (1) or (2) causing a realistic apprehension that the originator of the threat will commit the act. *Id.,* 82/5. Claims under the Gender Violence Act must be brought within 7 years. 740 ILCS 82/20; *Vince v. Illinois Cent. Sch. Bus, LLC*, No. 09 C 5360, 2011 WL 578832, at *17 (N.D. Ill. Feb. 9, 2011).

As alleged, Plaintiff's Gender Violence Act claims are predicated upon the incident that occurred with DeStefano in Las Vegas in October of 2012. *See* [1] at 15–16. Plaintiff described the incident in discovery responses and discussed it at her deposition, stating that DeStefano stalked her as she was walking to the bathroom,

led her into an empty room, forced the front of his body onto hers and started to unzip his pants; she also testified that he tried to grab her hands and put them on his crotch. [70-2] at 49, 53, 84. The incident happened in October 2012; she sued in October 2020, a year too late.

Plaintiff testified at her deposition, on July 16, 2021, that the 2012 incident was the only time DeStefano's harassment turned physical. [70-2] at 49. When asked at her deposition whether she had any other evidence to support her Gender Violence Claim, she said no. [70-2] at 68. She did not mention any other conduct that would constitute gender-related violence; nor did she mention threats of conduct that would constitute gender-related violation. Yet, in a declaration signed March 4, 2022, Plaintiff represents that she continued to worry DeStefano would try to force himself upon her again or that he would touch her inappropriately again. [74-3] at 4. Although the record plainly demonstrates that DeStefano made vulgar remarks to Plaintiff at least into 2018 (well within the statute of limitations period for a Gender Violence Claim), there is no evidence to suggest that DeStefano committed any act of gender-related violence within the limitations period. By her own admission, DeStefano never touched her after 2012 and the evidence belies her claim that his remarks, though base and degrading, threatened gender-related violence. Nor does her sworn deposition testimony establish that Plaintiff interpreted them as such. As a result, to the extent Plaintiff is claiming that DeStefano committed any act constituting gender-related violence within seven years of her complaint, the Court finds that the claim is not supported in the evidence in the record.

19

Based upon all of this, counts VIII and IX are time barred, and the Court thus grants Defendants' motion for summary judgment on these counts.[5]

## B.    Plaintiff's Discrimination Claim

Defendants argue that, even if Plaintiff's Title VII claims are timely, they nonetheless fail because Plaintiff suffered no adverse action, and the record contains no evidence to support a claim of discrimination.

In the posture of this case, the "singular question" before the Court is whether Plaintiff has proffered evidence that would permit a reasonable factfinder to conclude that her sex "caused the discharge or other adverse employment action." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (July 31, 2020)). She has done so.

Specifically, the record provides evidence from which a reasonable jury could conclude that sex improperly factored into the account assignment process. The record includes evidence indicating that when one customer (Roberts Heating) wanted to get rid of its female TM in favor of a male TM, TEC accommodated that request; yet when customers wanted to get rid of their male TM in favor of a female TM, TEC behaved quite differently, declining to accommodate the requested switch and accusing Plaintiff of poaching. Indeed, Denise Jacobazzi, whose account Mertz accused Plaintiff of poaching, testified that she requested Plaintiff because Plaintiff

---

[5] Plaintiff submitted additional authority concerning the IGVA, *see* [80]. But because the Court dismisses Plaintiff's IGVA claims based upon the statute of limitations, it need not decide whether the IGVA amendment applies here.

"always seemed engaged and was always helping people and knowledgeable about that type of stuff"; Plaintiff did not "poach" her account. [74-8] at 5–6. And a jury could infer that Mertz and TEC handled the account requests differently because Plaintiff is a woman. [70-8] at 8. For example, Plaintiff can produce evidence indicating that Skip Mungo undermined the company's sexual harassment training sessions, and, in response to sexually harassing behavior, stated that it was "a good thing he was the head of HR" among other comments.

To be sure, the record also contains evidence suggesting that TEC treated TMs differently, not because of their sex, but because of their relationship to Skip Mungo. Plaintiff even noted that Skip hired and offered favorable treatment to his best friends and relatives and their families. And she and Urbanski both observed that managers made operational decisions based upon favoritism and nepotism. But it will be up to a jury to decide whether Plaintiff experienced disparate treatment and, if so, why. Plaintiff believes she was treated differently because of her sex, and the evidence of discriminatory animus suffices to get Plaintiff to a jury on her sex discrimination claim.

### C.    Plaintiff's Retaliation Claim

Finally, Defendants argue that they are entitled to summary judgment on Plaintiff's Title VII retaliation claim because Plaintiff did not engage in any protective activity.

The relevant question for Title VII retaliation claims is whether the record contains "sufficient evidence to permit a reasonable fact finder to conclude that

21

retaliatory motive caused the discharge." *Igasaki*, 988 F.3d at 959. That is the case here.

Mungo testified that Plaintiff complained a lot; Smid testified that she was edgy and difficult. [70-8] at 4–5, 13. Ottoman said she "created her own demise from the standpoint of being difficult." [70-12] at 32. And, although she never complained to HR about DeStefano, she was vocal that she wanted to be present at the ABT factory tour and voiced her displeasure about being excluded from that tour and about her account assignments and reassignments.

Chad Mertz testified that Plaintiff yelled at him about not getting any of Jim Ready's accounts when Ready retired, [70-7] at 30, and Plaintiff testified that, having just come off a huge year when she won the President's Award, Mertz had no legitimate reason, other than her sex, to refuse to reassign her one or more of Ready's accounts. [70-2] at 33. Mertz also testified that Plaintiff went to Skip about not being allowed to attend the ABT factory tour, a decision Mertz made based upon gender. And Mertz testified that he fired Plaintiff based upon this conduct, all of which involved complaining about sex discrimination, perceived or real. Based upon such evidence in the record, a reasonable jury could find that TEC retaliated against Plaintiff based upon protected activity. And such a finding would be buttressed by evidence demonstrating that Mertz' stated reasons for firing Plaintiff could be found to be pretextual (Jacobazzi herself contradicted Mertz' "poaching" claim and TEC management confirmed that going to Skip with a complaint was not an act of

22

insubordination). The Court declines to grant summary judgment in Defendant's favor on this claim.

## IV. Conclusion

For the reasons explained above, this Court grants in part, and denies in part, Defendants' motion for summary judgment [68]. The Court grants Defendants' motion as to Plaintiff's sexual harassment claim (count I) and her Gender Violence Act claims (counts VIII and IX), because those claims are time-barred. The Court also dismisses, by agreement, Plaintiff's Equal Pay Act claims (counts IV, V, VI, and VII) under Rule 41(a)(2). Plaintiff may proceed on her Title VII discrimination and retaliation claims (counts II and III).

Dated: September 25, 2023                    Entered:

                                             John Robert Blakey
                                             United States District Judge